Zachary Jacobs
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
222 S Riverside Plaza
Chicago, Illinois 60606
Tel.: (973) 994-1700
zjacobs@carellabyrne.com

*Attorney for Plaintiff and the Proposed Class*

[*Additional Attorneys on Signature Page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANGELLA M. SMITH, individually, and on behalf of all others similarly situated, | Case No.: _____ |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | **CLASS ACTION** |
| TRANSUNION LLC, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendant. | |

Plaintiff Angella M. Smith ("Plaintiff"), by her undersigned counsel, files this Class Action Complaint on behalf of herself and a class of all similarly situated persons against Defendant TransUnion LLC ("TransUnion"). Plaintiff bases the foregoing allegations upon personal information and belief, the investigation of counsel, and states the following:

1.     Plaintiff Angella M. Smith ("Plaintiff"), individually and on behalf of the Class (members of the Classes, including Plaintiff, are referred to as "Class Members"), allege the following against TransUnion LLC ("TransUnion" or "Defendant"), based upon personal knowledge, the investigation of counsel, and on information and belief as to all other matters:

## **INTRODUCTION**

2.     In early June 2025, a major data breach occurred when hackers infiltrated Salesforce systems used by thousands of Salesforce customers – this breach was discovered by Google. The attack was carried out by an organized cybercrime group known as "The Com," linked to the infamous "ShinyHunters" collective ("Threat Actors").

3.     The Threat Actors used social engineering and software manipulation to access Salesforce's systems. Once inside, the Threat Actors downloaded massive amounts of customer data and issued ransom demands on those customers. This initial attack spread further through an AI chatbot platform that integrates with Salesforce. By stealing digital access tokens, the Threat Actors were able to enter hundreds of Salesforce databases containing sensitive business information such as customer records, account details, and internal sales data. Salesloft, Inc., the owner of the affected chatbot platform called Drift, later confirmed that the attackers were

primarily targeting passwords, cloud access keys, and other credentials that could be used to compromise additional systems.

4.     By late August 2025, one of the affected companies in the Salesforce Data Breach hired cybersecurity experts from Mandiant, Inc. to investigate, but by then the attackers had already expanded their campaign. Throughout September 2025, dozens of major companies – including TransUnion – reported that their Salesforce data had been compromised ("Data Breach"). On October 3, 2025, the hackers launched a dark-web site claiming to possess more than one billion stolen Salesforce records. They threatened to release the data unless companies paid to "regain control" and prevent public exposure.

5.     The stolen data for the Data Breach included extremely sensitive personal information such as names, Social Security numbers, addresses, and birthdates ("Data"). Unlike passwords, these details cannot be changed, making them especially valuable to identity thieves and data brokers. Such personal information also holds measurable financial value in today's digital economy, as many technology companies rely on user data for advertising and analytics revenue. Plaintiff and Class Members allege that Defendant failed to implement adequate safeguards to protect this sensitive information. Accordingly, Plaintiff and Class Members face a substantial risk of imminent and certainly impending harm, heightened here by the loss of their Social Security numbers – a class of PII which

is particularly valuable to identity thieves. Plaintiff and Class Members have and will continue to suffer injuries associated with this risk, including, but not limited to, a loss of valuable time and opportunity costs and mitigation expenses over the misuse of their PII. Plaintiff seeks all available relief.

## **JURISDICTION**

6.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class and at least one other Class Member is a citizen of a state different from Defendant.

7.     Defendant is headquartered and routinely conducts business in the State where this District is located, has sufficient minimum contacts in this State and has intentionally availed itself of this jurisdiction by marketing and selling products and services, and by accepting and processing payments for those products and services within this State.

8.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to Representative Plaintiff's claims took place within this District, and Defendant does business in this Judicial District.

## PARTIES

9.     Defendant TransUnion, LLC operates as an international information and insights company with its headquarters and principal place of business at 555 West Adams Street, Chicago, Cook County, Illinois. TransUnion is incorporated under the laws of the State of Delaware.

10.     Plaintiff Angella M. Smith ("Plaintiff") is a resident of the Ohio and received a notice of the Data Breach on September 10, 2025 ("Notice"), that informed her that her PII was compromised in the Data Breach, including her Social Security Number and Date of Birth. Plaintiff has already suffered injury and remains at a substantial and imminent risk of future harm.

## FACTUAL ALLEGATIONS

### 1.     DEFENDANT COLLECTED AND PROMISED TO PROTECT PLAINTIFF'S AND CLASS MEMBERS' DATA

11.     TransUnion is well aware of the necessity of data security for its customers and employees. It highlights that it regularly deals in consumer "public and proprietary information," which it claims to "steward[] with care."[1] TransUnion's Data Security page claims that "[t]he security and protection of consumer information is the highest priority for TransUnion."[2] TransUnion further

---

[1] TransUnion, *About Us*, https://www.transunion.com/about-us.

[2] *Id.*

claims that "[d]ata security and stewardship is vital to consumer protection and enabling trust. At TransUnion, we continually invest in improvements to protect the data we hold on behalf of consumers and businesses."[3]

12.    Yet despite these promises, Defendant failed to implement adequate cybersecurity protections.

13.    Due to the lack of MFA protection, TransUnion failed to prevent the theft of high-level administrative credentials, which should have required multiple security controls to use. As a result, the hackers were able to obtain compromised credentials for a contractor handling backend technical support and then steal data for millions of customers.

14.    If TransUnion had required MFA to access sensitive information, the hackers would have been unable to use the compromised credentials to perpetrate the Data Breach.

15.    Plaintiff and Class Members utilized TransUnion's products and services on the reasonable expectation that TransUnion would comply with its obligations to keep such information confidential and secure. TransUnion failed to comply with these obligations.

16.    TransUnion could have, and should have, taken steps that would have mitigated the risks from the typical and fundamental hacking tactics that resulted in

---

[3] *Id.*

this Breach.

17.     The Data Breach was accomplished by using stolen access credentials, which did not require MFA when accessing unencrypted data stored in an internet accessible location. Defendant could have prevented the Data Breach by, *inter alia*, implementing spam filters to prevent phishing messages from reaching its employees, educating employees to detect and report phishing or other attempts to acquire access credentials, employing MFA to prevent stolen credentials from being misused to gain access to sensitive data, ensuring that Data was properly encrypted or redacted when accessed by contractors, limiting access to Data to only necessary employees, and monitoring the network for instances of unauthorized access or unusual activity, including access to and the transfer of large volumes of the data.

### 2.     PLAINTIFF AND CLASS MEMBERS ARE VICTIMS OF THE DATA BREACH

18.     In early June 2025, Google's corporate Salesforce instance (used to store contact data for small- and medium-sized business clients) was compromised through a vishing-extortion campaign orchestrated by the threat-group tracked as UNC6040 & UNC6240 (online cybercrime collective known as "The Com" linked to "ShinyHunters" referred to as the "Threat Actors").[4]

---

[4] Seqrite, *Google Salesforce Breach: A Deep Dive into the Chain and Extent of the Compromise* (Sept. 2, 2025), https://www.seqrite.com/blog/google-salesforce-breach-unc6040-threat-research/.

19.     The Threat Actors combined three core vectors:

a.  Voice-phishing ("vishing") – Impersonating IT staff in a convincing phone call, persuading a Google employee to approve a malicious application connected to Salesforce, a rapid-reply extortion scheme demanding Bitcoin payments within 72 hours;

b.  OAuth application abuse – the deployment of custom Python scripts that emulate Salesforce's DataLoader, allowing automated bulk exports;[5] and

c.  Anonymity layers – Mullvad VPN-initiated calls followed by TOR-based data exfiltration, which anonymized the actors' true location.[6]

20.     The detection of this attack marked the beginning of one the most significant cyber incidents in late 2025, which compromised the Salesloft Drift (AI chat-bot/assistant) used for its Salesforce integration.[7] The theft of OAuth token resulted in running SOQL queries on Salesforce databases that held objects such as cases, accounts, users, and opportunities.[8] The attack affected hundreds of

---

[5] "Oauth" is an authorization framework that allows third-party applications to access user data on another service without requiring the user to share their password.

[6] *Id.*

[7] *Id.*

[8] *Id.*

Salesforce customers, impacting not just Salesforce users but also other third-party integrations. Salesloft said "Initial findings have shown that the actor's primary objective was to steal credentials, specifically focusing on sensitive information like AWS access keys, passwords and Snowflake-related access tokens."[9] Google explicitly warned of the breach's extensive scope beyond its own systems.[10]

21.     On August 28, 2025, Salesloft engaged Mandiant, a cybersecurity firm, to investigate the compromise of the Drift platform and its technology.[11] At that time, it was too late. The Threat Actor had already abused Salesloft Drift to launch a credential harvesting campaign in August, targeting hundreds of Salesforce instances using compromised OAuth tokens.[12]

22.     Throughout September 2025, the Threat Actors hacked dozens of high-

---

[9] *Id.*

[10] *Id.*

[11] Google Threat Intelligence Group, *Widespread Data Theft Targets Salesforce Instances via Salesloft Drift* (Aug. 27, 2025), https://cloud.google.com/blog/topics/threat-intelligence/data-theft-salesforce-instances-via-salesloft-drift

[12] *See* DataBreaches.net, *Salesloft+Drift Update on Investigation Results* (Sept. 7, 2025), https://databreaches.net/2025/09/07/salesloftdrift-update-on-investigation-results/ (The Mandiant investigation showed the Threat Actors gained access to the Salesloft GitHub account even earlier, between March and June 2025, where the hackers conducted reconnaissance activities in the Salesloft and Drift application environments. After gaining access, the Threat Actors downloaded content from multiple repositories and was able to establish workflows. "The threat actor then accessed Drift's AWS environment and obtained OAuth tokens for Drift customer's technology integrations," Salesloft said in the post.).

profile companies by breaking into their cloud-based databases hosted by Salesforce.

23.     TransUnion confirmed that its data was stolen in a mass attack.[13]

24.     On October 3, 2025, the Threat Actors launched a website pressuring companies to pay the hackers to avoid having their stolen data published online. Stating: "contact us to regain control on data governance and prevent public disclosure of your data; and do not be the next headline. All communications demand strict verification and will be handled with discretion."[14]

25.     At the top of the site, the Threat Actors mention Salesforce and demand that the company negotiate a ransom, threatening that otherwise "all your customers [sic] data will be leaked."[15]

### 3.     PLAINTIFF AND CLASS MEMBERS HAVE BEEN HARMED

26.     Plaintiff and Class Members entrusted Defendant with sensitive and valuable PII, including but not limited to full names, SSNs, addresses, birthdates,

---

[13] *Id.* Insurance giant Allianz Life, Google, fashion conglomerate Kering, the airline Qantas, carmaking giant Stellantis, and the employee management platform Workday, among several others, have confirmed their data was stolen in these mass hacks. The hackers' leak site lists several alleged victims, including FedEx, Hulu (owned by Disney), and Toyota Motors.

[14] Lorenzo Franceschi-Bicchierai & Zack Whittaker, *Hacking Group Claims Theft of 1 Billion Records from Salesforce Customer Databases* (Oct. 3, 2025), TechCrunch, https://techcrunch.com/2025/10/03/hacking-group-claims-theft-of-1-billion-records-from-salesforce-customer-databases/

[15] *Id.*

and other identifiable information. This data has an actual, measurable value in today's digital economy.

27. Defendant collects, stores, and monetizes user data as a regular part of their business model. In doing so, Defendant implicitly recognize that PII has substantial value. Major technology companies routinely disclose the average revenue generated per user ("ARPU") in their financial filings, with leading platforms generating $15–$50 per user per month from advertising, profiling, and service optimization.

28. The compromised PII is of economic value because it cannot be easily changed. A compromised password can be reset. A stolen Social Security number or birthdate cannot be obtained. It is immutable. This permanence renders the information more useful—and therefore more valuable—to identity thieves and data brokers.

29. As a result of Defendant's failure to adequately safeguard Plaintiff's and Class Members' PII they seek compensatory damages for the measurable value of their compromised data, the cost of future protective measures, time spent remedying exposure, and non-economic damages arising from the violation of privacy rights.

30. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Prey, a company that develops device

tracking and recovery software, stolen PII can be worth up to $2,000.00 depending on the type of information obtained.

31.    Theft of PII can have profound consequences for the victim. The FTC warns consumers that identity thieves use PII, particularly social security numbers, to open new bank accounts, take out loans, start new utility accounts, and incur charges and credit in a person's name.

32.    There are time lags between when PII is stolen, when it is used, and when a person discovers it has been used. On average, it takes about three months for consumers to discover that their identity has been stolen and used, but it takes some people up to three years to learn that information.

33.    To protect themselves, Plaintiff and Class members will need to remain vigilant against unauthorized data use for years or even decades to come.

34.    One such example of criminals using PII for profit is the development of "Fullz" packages, or dossiers on individuals. The development of Fullz packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. Importantly, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal

and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members.

35.     According to the U.S. Federal Bureau of Investigation ("FBI"), in 2023, Internet-enabled crimes reached their highest number of complaints and dollar losses, resulting in more than $12.5 billion in losses to individuals and business victims.

36.     In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend considerable time repairing the damage caused by theft of their PII and PHI.

37.     In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft. Victims of new account identity theft will have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank and credit accounts, open new ones, and dispute charges with creditors.

38.     The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated, "[m]ost consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."

39.     An active and robust consumer marketplace for PII also exists. The global data brokering industry in 2024 is worth about $389.765 billion. . The data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

40.     As a result of the Data Breach, Plaintiff's, and Class members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class members for their property, resulting in an economic loss. Moreover, their PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

41.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (a) encrypting information stored on computer networks; (b) retaining payment card information only as long as necessary; (c) properly disposing of personal information that is no longer needed; (d) limiting administrative access to business systems; (e) using industry-tested and accepted methods for securing data; (f) monitoring activity on networks to uncover

14

unapproved activity; (g) verifying that privacy and security features function properly; (h) testing for common vulnerabilities; and (i) updating and patching third-party software.

42. According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history, and reputation, and can take time, money, and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

43. To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive consumer data. *See In re Lookout Servs., Inc.*, 151 F.T.C. 532, 535 (June 15, 2011) (the defendant "allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as by employing an intrusion detection system and monitoring system logs"); *In re DSW, Inc.*, 2006 WL 6679055, at *2 (FTC Mar. 7, 2006) (the defendant "failed to employ sufficient measures to detect unauthorized access"); In re TJX Cos., Inc., 2008 WL 3150421, at *2, (FTC Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different

passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks"); *In re Dave & Buster's Inc.*, No. C-4291 (FTC May 20, 2010) (the defendant "failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between in-store networks"). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations.

44. Defendant failed to adequately protect Plaintiff's and Class members' PII and allowed criminals access to this sensitive data to use in the conduct of criminal activity. Specifically, Defendant failed to adequately protect Plaintiff's and Class members' PII from people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

45. Defendant's failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has failed to adequately protect the PII of Plaintiff and millions of Class Members from unscrupulous operators, con artists, and outright criminals.

## **CLASS ALLEGATIONS**

46.    Plaintiff brings this action on behalf of himself and all other persons similarly situated pursuant to 735 ILCS 5/2-801 and seeks certification of the following Class:

> All individuals that received or were otherwise sent notice that their data was potentially compromised due to Defendant's Data Breach.

47.    Excluded from the class is TransUnion and its subsidiaries and affiliates; all employees of TransUnion; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

48.    Plaintiff reserves the right to, after conducting discovery, modify, expand or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

49.    **Numerosity**. The members of the Class are so numerous that joinder of all Class members is impracticable. Plaintiff believes that there are over one million members of the Class. The precise number of class members, however, is unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include mail, electronic mail, internet postings, and/or published notice.

50. **Commonality and Predominance**. This action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

    a.    Whether TransUnion knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

    b.    Whether TransUnion controlled and took responsibility for protecting Plaintiff's and the Class's data when solicited that data, collected it, and stored it on its servers;

    c.    Whether TransUnion owed Plaintiff and the Class a duty to implement reasonable security measures;

    d.    Whether Defendant's failure to adequately secure Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

    e.    Whether Defendant's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiff's and the Class's data;

    f.    Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

    g.    Whether Plaintiff and the Class were injured and suffered damages or other losses because of Defendant's failure to reasonably protect its data systems; and

    h.    Whether Plaintiff and the Class are entitled to relief.

51. **Typicality**. Plaintiff is a typical member of the Class. Plaintiff and the Class are each persons whose data was provided to TransUnion, whose data resided on TransUnion servers, and whose Protected Information was exposed in

Defendant's Data Breach. Plaintiff's injuries are similar to other class members and Plaintiff seeks relief consistent with the relief due to the Class.

52.     **Adequacy**. Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against TransUnion to obtain relief for himself and for the Class.  Plaintiff has no conflicts of interest with the Class.   Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases.  Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

53.     **Superiority**. Class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

54. **Injunctive and Declaratory Relief**. TransUnion, through its uniform conduct, acted or refused to act on grounds applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## CAUSES OF ACTION

### COUNT I
### BREACH OF IMPLIED CONTRACT

55. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

56. Plaintiff repeats and re-alleges the factual allegations set forth above and incorporates the same as if set forth herein.

57. Plaintiff brings this Count on behalf of the Classes under the laws of the State of Illinois.

58. Plaintiff and Class Members entered an implied contract with Defendant when they subscribed or used services from Defendant and provided their PII to Defendant.

59. By collecting PII from its customers, Defendant impliedly agreed to safeguard and protect the PII of Plaintiff and Class Members and to timely and accurately notify them if their PII was breached or compromised. Plaintiff and Class Members would not have used Defendant's products or Services in the absence of the implied contract or implied terms between them and Defendant. The

safeguarding of the PII of Plaintiff and Class Members was critical to realize the intent of the parties.

60.    Specifically, Defendant impliedly agreed and expressly stated in all applicable Privacy Policies that, in exchange for Plaintiff's and Class Members' provision of PII, Defendant would, among other obligations, maintain safeguards designed to protect the PII it collected, limit access to the PII to necessary personnel, and give timely and accurate notification if a breach occurs.

61.    Plaintiff and Class Members fully performed their obligations under the express and/or implied agreements with Defendant by providing their PII and abiding by the Terms and Conditions.

62.    Defendant materially breached its express and/or implied agreement with Plaintiff and Class Members by failing to protect their PII. Specifically, they (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) allowed Plaintiff's and Class Members' PII to be disclosed to unauthorized third parties; and (3) failed to provide adequate information regarding the Breach in order for Plaintiff and Class Members to undertake proper precautionary measures, in violation of the Agreements.

63.    As a direct and proximate result of Defendant's breach of the express and/or implied agreements, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

## COUNT 2
## NEGLIGENCE

64.     Plaintiff repeats and re-alleges the factual allegations set forth above and incorporates the same as if set forth herein.

65.     Plaintiff brings this Count on behalf of the Classes under the laws of the State of Illinois.

66.     Defendant required Plaintiff and Class Members to submit sensitive PII to use Defendant's products and services and collected and stored sensitive personal information about its customers on its own, either automatically as customers used Defendant's products and services, or through third-party data sources.

67.     Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

68.     Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was properly secured and protected; (b) maintaining security measures consistent with

industry standards discussed herein; and (c) failing to delete customer PII that Defendant no longer reasonably needed to keep.

69. Defendant's duty to use reasonable care arose from several sources, including but not limited to the following:

70. Defendant hold themselves out as protectors of consumer data and thereby assume a duty to protect the data that was provided to it by Plaintiff and Class Members. Because of their role as one of the largest CRMs and credit bureaus, Defendant were in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members because of the Defendant's Data Breach. Defendant's own privacy policies set forth some of the duties it assumed when obtaining customers' PII;

71. Defendant's duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII by companies such as Defendant.

72. Defendant violated Section 5 of the FTC Act and similar state consumer protection statutes by failing to use reasonable measures to protect PII and not comply with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII they

obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Classes. Plaintiff and Class Members were within the class of persons the FTC Act and similar state consumer protection statutes were intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statutes were intended to guard against.

73.     Defendant had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiff and Class Members would be harmed by Defendant's failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes and had targeted Defendant's data systems prior to the Data Breach.

74.     Defendant's duty to use reasonable security measures also arose because of the special relationship that existed between Defendant, on the one hand, and Plaintiff and Class Members, on the other hand. The special relationship arose because Plaintiff and Class Members entrusted Defendant with their PII as part of their use of Defendant's products and services. Defendant alone could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breach.

75.    Defendant were subject to these "independent duties," untethered to any contract between Defendant and Plaintiff and Class Members.

76.    Defendant knew or should have known that its computing systems and data storage were vulnerable to unauthorized access and targeting hackers for the purpose of stealing and misusing confidential PII.

77.    Defendant breached the duties it owed to Plaintiff and Class Members described above and thus were negligent. Defendant breached these duties by, among other things, failing to: (a) exercise reasonable care and implement proper security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class Members; (b) maintain security systems consistent with industry standards during the period of the Data Breach; and (c) comply with federal regulations protecting the PII at issue during the period of the Data Breach.

78.    Plaintiff and Class Members were foreseeable victims of Defendant's inadequate data security practices, and it was also foreseeable that injury to Plaintiff and Class Members would result as described in this Complaint.

79.    Plaintiff and Class Members had no ability to protect their PII that was in, and remains in, Defendant's possession.

80.    Defendant could protect against the harm suffered by Plaintiff and Class Members in the Data Breach.

81.     Defendant's duty extended to protecting Plaintiff and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B (1965). Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

82.     But for Defendant's wrongful breach of its duties, Plaintiff's, and Class Members' PII would not have been compromised.

83.     Defendant's failure to take proper security measures to protect the sensitive PII of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiff's and Class Members' PII.

84.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse of Plaintiff's and Class Members' PII, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the

confidentiality of the stolen PII; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

**COUNT 3**
**UNJUST ENRICHMENT**

85. Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 84 above and incorporates the same as if set forth herein.

86. Plaintiff brings this Count on behalf of the Classes under the laws of the State of Illinois.

87. Plaintiff and Class Members entrusted their PII, which has inherent value, to Defendant to facilitate their receipt of services and direct benefits from Defendant.

88.     Defendant understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential, and that its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

89.     Defendant never provided Plaintiff and Class Members for consideration of such use of their PII, and Plaintiff and Class Members provided no permission for such use.

90.     Notwithstanding the additional monies earned by Defendant from the PII of Plaintiff and Class Members, Defendant did not take adequate measures or protections to prevent the kind of data breach that gives rise to this litigation.

91.     It is inequitable, unfair, and unjust for Defendant to retain the profits it wrongfully obtained by its retention and use of the PII of Plaintiff and Class Members, and its retention of such profits violates fundamental principles of justice, equity, and good conscience.

92.     Defendant are therefore liable to Plaintiff and Class Members for restitution or disgorgement of such unjustly accrued profits.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of himself and the Class, requests that this Court award relief as follows:

a.     An order certifying the class and designating Plaintiff as the Class Representative and their counsel as Class Counsel;

b.   An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

c.   A declaratory judgment in favor of Plaintiff and the Class;

d.   Injunctive relief to Plaintiff and the Class;

e.   An award of attorneys' fees and costs as allowed by law; and

f.   An award such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all the claims so triable.


Dated: December 10, 2025                    Respectfully submitted,


By:   _/s/ Zachary Jacobs_
Zachary Jacobs
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
222 S Riverside Plaza
Chicago, Illinois 60606
Tel.: (973) 994-1700
zjacobs@carellabyrne.com

James E. Cecchi
Jason H. Alperstein
Jordan M. Steele*
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com

jalperstein@carellabyrne.com
jsteele@carellabyrne.com

*Counsel for Plaintiff and the
Proposed Class*

  *pro hac vice forthcoming